UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

Nº 13-cv-2539 (JFB) (WDW)
_____

JAMES G. PAULSEN, REGIONAL DIRECTOR OF REGION 29 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD,

Petitioner,

VERSUS

REMINGTON LODGING & HOSPITALITY, LLC,

Respondent.
_____

**MEMORANDUM AND ORDER**
August 14, 2013
_____

JOSEPH F. BIANCO, District Judge:

Petitioner James G. Paulsen, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board ("petitioner" or "the Board") brings this action against Remington Lodging & Hospitality, LLC ("respondent" or "Remington") pursuant to Section 10(j) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(j). Petitioner alleges that respondent engaged in unfair labor practices within the meaning of the Act when it terminated its entire housekeeping department after the employees began organizing on behalf of a union and engaged in other activities with the intention of discouraging unionization.

On April 26, 2013, petitioner filed this action seeking a temporary injunction, in which petitioner requests an order barring respondent from engaging in further unfair labor practices and immediately reinstating all employees whom respondent terminated pending the final disposition of the matter currently before the Board. After submissions were filed by both parties, the Court held an order to show cause hearing on May 6, 2013. Following the hearing, the Court invited further briefing by the parties. On May 15, 2013, Administrative Law Judge ("ALJ") Raymond Green issued his decision finding several violations of the Act by respondent as alleged by petitioner, which is on appeal before the Board. The matter was fully submitted before this Court on May 17, 2013. On May 22, 2013, the Court orally denied on the record

petitioner's motion for a preliminary injunction.[1]

As set forth more fully below, the Court concluded in its discretion that an order of immediate reinstatement pending final disposition by the Board was unwarranted in this particular case. This Court recognizes the important role that Section 10(j) of the Act plays in ensuring that the Board's remedial authority is not frustrated or nullified by the passage of time that is inherent in the Board's administrative litigation. However, in determining whether injunctive relief under Section 10(j) is "just and proper," the Court also has an obligation to consider the specific factual circumstances before it and the equitable considerations surrounding the exercise of its discretion. Here, the circumstances are rather unusual.

First, petitioner delayed seeking this injunctive relief for approximately 6 months, including a 3-month delay after the unfair labor practice charges were filed in January 2013. Second, the employer has already agreed (without any injunction) to reinstate all of the employees who were terminated and has been rapidly re-hiring all employees interested in reinstatement. Specifically, (1) at the time petitioner's motion was fully submitted, 37 employees eligible were for reinstatement, and of those, only 16 were waiting for a position to become available because 8 employees had not responded to the employer's letter and 13 offers had been made; (2) at the time of this Memorandum and Order, only 8 employees are waiting for a position to open (and 4 of those 8 have turned down PM shift positions and are waiting for future AM shift openings); and (3) it is extremely likely that these remaining 8 employees will receive positions over the next 60 days based upon the historical rate at which Remington has made offers. Third, if the Court were to order immediate reinstatement, the current workers would be displaced. The fundamental question facing this Court is the following: should the Court, given the substantial delay that has already occurred, allow an orderly and voluntary reinstatement of the terminated employees to the status quo ante over a relatively short period of time, which would also include back pay for the reinstated employees if petitioner ultimately prevailed in the administrative process, or should the Court order immediate reinstatement and displace the current workers (with no back pay should it ultimately be determined in the administrative process that the charges are without merit)? The Court believes the latter option is not the just and proper result in this particular case. The Court is not punishing the employees for the Board's delay; rather, it simply concludes in its discretion, given the delay and the rapid reinstatement schedule by the employer, that the reinstatement injunction is unnecessary at this juncture to prevent any irreparable harm or to preserve the status quo that existed before the onset of the alleged unfair labor practices. Because of the employer's voluntary reinstatement program, that status quo (to the extent it can be achieved given the Board's delay) is rapidly approaching without the need for any such injunction.

---

[1] Respondent also argued that there was no evidence in the record that petitioner was granted authority to bring this action by the Board, and that even if he was granted the authority, that such authorization was invalid because the Board lacks a quorum. (*See* Resp't's Mot. to Dismiss Pet. For Preliminary Injunction, May 2, 2013.) Because the Court held that petitioner had not demonstrated that an injunction was just and proper in this case, the Court declined to reach this issue during the oral ruling. However, because the Court, based upon a subsequent separate motion, is now granting the injunction in part – namely, prospectively enjoining respondent from engaging in unfair labor practices – the Court addresses this issue *infra*.

2

The principal reasons cited by petitioner for immediate reinstatement are unpersuasive in this particular situation. First, petitioner argues that the employees will scatter (i.e., find new jobs and not want to return to their previous employment) unless there is immediate reinstatement. As a threshold matter, the Court believes that most, if not all, of the scattering already took place during the 6-month delay by petitioner in seeking the 10(j) injunction. For example, by the time the motion was fully submitted to this Court, over one-third of the employees had declined or not responded to an offer for reinstatement. Thus, it is abundantly clear that the risk of additional scattering is minimal at this juncture. Second, petitioner contends that, notwithstanding the voluntary reinstatement of the employees by respondent, the Court also should still order reinstatement as a form of judicial encouragement to the employees. That assertion overlooks the constitutional doctrine of mootness. Such an argument suggests that, even if the employer had already reinstated all the workers, the Court should still order reinstatement, even though the requested relief already had been achieved. Such a contention has no support in the law. However, to the extent petitioner has legitimately raised a concern about the chilling impact that the terminations may have had on the union's organizational efforts, the Court (as a result of a separate motion made for a cease and desist injunction) will enjoin the employer from taking any retaliatory action toward the reinstated employees. The employees will be aware that any such retaliation would be a violation of the injunction and place the employer in contempt of court. Finally, petitioner points to other cases where courts have ordered immediate reinstatement notwithstanding greater periods of delay by the Board than in this case. However, all of those cases are distinguishable because none of them involved a situation, as we have here, where the employer has agreed to reinstate the workers in a very short period of time while the administrative process is being completed and also agreed to a prospective injunction restraining them for committing future unfair labor practices.

Although petitioner would like the Court to robotically issue the injunction with a blind indifference to the facts *as they exist now*, that is not the legal standard. The status quo (including reinstatement) has been largely restored already for most of the terminated employees and will be fully restored over the next 2 months. Under such circumstances, the reinstatement injunction is unnecessary at this juncture to prevent any future irreparable harm and, thus, would not be just and proper. As noted above, the purpose of the reinstatement injunction is to prevent employees from being out of their jobs for the long time it will potentially take for the administrative process to conclude, including months or years of appeals. That purpose will be fully satisfied without the reinstatement injunction because of the voluntary reinstatement of workers that has already taken place and the complete restoration that will very likely be over in 2 months (if not sooner). These employees will be working for respondent during the remainder of the administrative process and, thus, a Section 10(j) reinstatement order is wholly unnecessary.

\* \* \*

On July 22, 2013, petitioner filed a motion for a preliminary injunction pending appeal. On July 23, 2013, the Court held a phone conference with the parties. Although petitioner initially did seek an order barring respondent from engaging in further unfair labor practices separate from the motion for

3

an order of immediate reinstatement, petitioner made clear that it wished to pursue the "cease and desist" injunction separate from the order of reinstatement. The Court allowed respondent to address that specific request for injunctive relief. In its response letter, dated July 26, 2013, although respondent argued that the proposed injunction prohibiting future violations was unnecessary because there were no ongoing violations, it consented to the Court imposing such an order. (*See* Resp't's July 26, 2013 Letter, at 3 ("Respondent would not object to this Court entering an order directing it to not violate the seven listed ULPs in 'part A' of the Board's proposed order").) Accordingly, for the reasons set forth below, the Court grants petitioner's motion for an injunction restraining respondent, until the matter currently before the Board is resolved, from engaging in certain enumerated unfair labor practices.[2]

Finally, for the reasons set forth herein, the motion for an injunction pending appeal is denied. As noted above, the cease and desist injunction is already in place pending final disposition of the matter currently before the Board. The reinstatement issue, which is the only issue on appeal, will almost certainly be moot within approximately 60 days (if not sooner) as the few remaining yet-to-be-reinstated employees are rehired. It is difficult for petitioner to argue that these 2 remaining months will result in any irreparable harm when the Board waited 6 months to make the motion (and 2 months to file the notice of appeal). In short, there is clearly no need for an order of reinstatement pending appeal under the particular circumstances of this case.

I. BACKGROUND

A. Factual Background

The following facts are derived from the ALJ's decision in this matter, as well as the parties' motion papers, declarations, and representations at oral argument.

Remington is a hotel management company operating 70 hotels. (ALJ Decision, May 15, 2013, ECF No. 13-1, at 3.) In December 2011, Remington replaced Hyatt Corporation as the managing company of the Hyatt Hotel in Hauppauge, New York (the "Hotel"). (*Id.* at 2-3.) Prior to Remington's involvement with the property, the housekeeping staff consisted of individuals employed by Hospitality Staffing Solutions ("HSS"), a staffing agency. (*Id.*) However, after Remington began managing the property, it hired those employees directly and ceased its relationship with HSS. (*Id.* at 3.)

In April 2012, a representative of Local 947, United Service Workers Union, International Union of Journeymen and Allied Trades (the "Union") began communicating with some of the housekeeping staff regarding unionization. (*Id.* at 4.) The ALJ determined that by June 10, 2012, Remington was aware that the Union was soliciting employees inside the hotel. (*Id.*) Representatives of Remington

---

[2] Although the denial of the motion for the order of reinstatement is on appeal, this Court is still permitted to issue injunctive relief pursuant to Rule 62(c) of the Federal Rules of Civil Procedure. Here, this injunction (1) is without objection, (2) is necessary to preserve the status quo (namely, to prevent any future unfair labor practices), and (3) does not impact the pending appeal of this Court's denial of a reinstatement order. Thus, although this rule has been narrowly interpreted by the Second Circuit, this Court has the authority to enter this injunction under these circumstances. *See New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 758-59 (2d Cir. 1977); *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962).

had conversations with the housekeeping staff regarding the Union, and the ALJ determined that these conversations "constituted illegal interrogations" under the Act. (*Id.* at 5.)

Sometime after the Union began communicating with employees, but no later than June 28, 2012, Remington began discussing the possibility of subcontracting the housekeeping work to HSS, i.e., entering into the same relationship it terminated upon its takeover of the Hyatt property. (*Id.*) In an e-mail to top executives of Remington, a division manager stated that the decision to end the previous outsourcing relationship was "to improve guest satisfaction and operations scores," but that "[t]his approach has not delivered the expected results as our scores are still a major problem for this hotel." (*Id.*) "In order to improve the hotel's financial position and flow through, as well as to improve operational efficiencies," the division manager recommended reentering into a relationship with HSS. (*Id.*) On August 16, 2012, Remington and HSS agreed that the housekeeping work would be subcontracted to HSS and that this relationship would begin on August 21. (*Id.* at 7.) On August 20, 2012, Remington notified the housekeeping staff that HSS was taking over the housekeeping functions and that if they wished to be hired by HSS, they should fill out applications. (*Id.*) Most employees filled out applications and most of those employees were hired; only those employees whose information was questioned by HSS's e-verify system were not hired. (*Id.*) The employees received "substantial wage increases." (*Id.*) Although the employees were on the payroll of HSS, "they continued to be supervised by Remington." (*Id.* at 9.)

On August 20, 2012, the Union filed its first representative petition. On September 11, 2012, the Union filed a new petition for a unit of approximately 40 housekeepers, housemen, maintenance workers, and drivers. (*Id.* at 7.) The petition listed both Remington and HSS as employers. The petition was amended numerous times, and the final amendment on October 16, 2012 lists only Remington as the employer and sought to have an election in a wall to wall unit consisting of 120 employees. (*Id.* at 9.)

Meanwhile, in September 2012, just one month after renewing the relationship, Remington and HSS began discussions regarding the termination of their contract. HSS agreed to terminate the contract and not enforce a penalty clause against Remington contained therein. (*Id.* at 9-10.) In addition, Remington recruited a new housekeeping staff and trained them at another hotel; however, HSS was unaware of this action by Remington. (*Id.* at 10.) On October 19, 2012, all 40 members of the housekeeping staff were fired and were told that they would not be rehired by Remington. (*Id.*)

Based on all of the evidence in the record, the ALJ concluded that Remington violated the Act by: (1) contracting out the housekeeping department to HSS in August 2012 (*id.* at 8), and (2) choosing "not to hire the housekeeping employees [in October 2012] because of their continued union activities and to avoid a possible adverse consequence resulting from the pending election petition" (*id.* at 10).

The ALJ also concluded that other actions by Remington constituted violations of the Act. The ALJ determined that, in August and September 2012, two of respondent's supervisors engaged in unlawful interrogations of employees regarding union activity and issued threats of reprisals against employees if they voted to unionize. (*Id.* at 11.) In addition, Remington issued three leaflets to employees in January 2013. (*Id.* at 12-13.)

5

Although the ALJ determined that two of the three pieces of information distributed by Remington were lawful and "fairly typical in union election campaigns," the ALJ found that Remington's threat in one leaflet that it would more strictly enforce its existing disciplinary rules if the employees unionized was an unlawful statement. (*Id.* at 13.)

The ALJ also found that respondent discharged Margaret Loiacono ("Loiacono") for discriminatory reasons. Loiacono did not join the Union or assist it any way and, therefore, she was not engaged in protected concerted activity. (*Id.* at 16.) However, in December 2012, in anticipation of a union election campaign, Remington distributed pie charts to employees regarding their compensation and how it was divided. When respondent gave her this chart, Loiacono mentioned that she had previously been a member of a union. After noticing a mistake on the chart regarding compensation, Loiacono engaged in a conversation about the chart with another employee. When that employee reported the content of the conversation to management, a supervisor at Remington sent the Hotel's manager an e-mail on December 31, 2012 detailing Loiacono's strong reaction to the pie chart. On January 2, 2013, Remington terminated Loiacono. (*Id.* at 14-15.) The ALJ held: "In these circumstances, it seems to me that the Respondent's view of Loiacono's reported extravagant reaction to the pie charts could likely have led management to view her as a potential thorn in the side when it came to other campaign literature that it intended to issue as an election drew nearer." (*Id.* at 15-16.)

On November 27, 2012 and January 7, 2013, the Union filed unfair labor practice charges with the Board. (*See* Pet'r's Mem. of P & A in Supp. of Pet. for Prelim. Inj. under Section 10(j) of the Nat'l Labor Relations Act ("Pet'r's Mem.") at 2.)[3] Following an investigation, the Board issued a Complaint and Notice of Hearing on February 13, 2013. A trial before an Administrative Law Judge began on March 5, 2013 and concluded on March 20, 2013. (*Id.* at 2-3.)

Shortly after the Union filed the initial unfair labor practice charge, Remington began the process of rehiring the discharged employees. On December 6, 2012, the General Manager of the Hotel sent a letter to the housekeeping employees for whom he had contact information. (Decl. of Jeff Rostek, May 2, 2013 ("Rostek May 2 Decl.") ¶ 2.) The letter enclosed an application for employment, "encourage[d]" individuals to apply, and stated that "as positions become available, all current applicants will be considered for employment." (Rostek May 2 Decl. Ex. 1.) As a result of this letter, the Hotel received four completed applications. (Rostek May 2 Decl. ¶ 3.) On March 18, 2013, the General Manager sent all members of the housekeeping staff listed on the NLRB Complaint a more detailed letter along with an employment application. The letter stated that the Hotel had one position currently available and that this letter constituted an "unconditional offer of employment" to the first person to contract the Hotel's Human Resources Director. (Rostek May 2 Decl. Ex. 2.) The letter also stated that additional positions would become available and would also be filled on a "first-come first-serve" basis. (*Id.*)

---

[3] Although the Union did not file the first unfair labor practice charge until November 27, 2012, the Board learned of Remington's decision to discharge the workers on October 19, 2012, the same day as the employees learned of this action. (*See* Resp't's Opp'n to Pet. for Prelim. Inj. ("Resp't's Opp'n") Ex. B, E-mail from Brent Childerhose, Oct. 19, 2012, ECF No. 7-2.)

6

On March 21, 2013, a Union representative appeared at the Hotel with 22 employees. (May 17, 2013 Decl. of Jeff Rostek ("Rostek May 17 Decl.") ¶ 5.) The employees were asked to sign their names and provide a phone number. (*Id.*) However, four of the names on the list are not included in the NLRB's complaint. (*Id.*)

As of May 17, 2013, 29 eligible housekeeping employees had indicated that they were interested in returning to work. Of these 29, the Hotel had hired 6 (including one employee who was rehired in October 2012 shortly after discharge). (*Id.* ¶ 11.) The Hotel had received 5 rejections of offers, including one by an employee who returned to work and then quit after one day. (*Id.*) Eight employees had not responded to the Hotel, and there were 2 offers outstanding as of that date. (*Id.*) Thus, as of the Court's oral decision, there were only 16 additional employees who needed to receive offers of employment to complete the process of attempting to rehire all discharged employees. (*Id.*)[4]

Remington also states that it did not employ as many staff members in May 2013 as it did in October 2012 because the hotel experiences significantly lower occupancy between November to April. (Rostek May 2 Decl. ¶¶ 12-13.) Remington stated that it had begun hiring more housekeeping staff in preparation for the busy summer season. (*Id.* ¶¶ 12-14.) In addition, Remington stated that additional positions will become available due to the high turnover for housekeeping staff in the industry. (*Id.* ¶¶ 9-11.) Thus, Remington expected that all of the remaining discharged employees would receive offers of employment within several months.

The Board claims that respondent's actions have discouraged Union activity. For example, a representative of the Union states that one of the housekeeping employees used to call him once a week asking about this case and whether there would be union meetings in the future. However, since she was rehired by Remington, this employee no longer contacts the Union representative. (Aff. of Jose Vega, Apr. 24, 2013 ¶ 8.)

II. APPLICABLE LAW

Section 10(j) of the Act grants the Board the power to "petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). "In this Circuit, in order to issue a § 10(j) injunction, the district court must apply a two-prong test. First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper." *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364-65 (2d Cir. 2001).

In determining whether there is reasonable cause to believe an unfair labor practice has been committed, "[t]he court need not make a final determination that the conduct in question is an unfair labor practice. It need find only reasonable cause to support such a conclusion. Appropriate deference must be shown to the judgment of the NLRB, and a district court should

---

[4] There is a minor disagreement between the parties regarding the number of discharged employees and, therefore, the number of employees eligible for employment. Respondent states that two employees listed on the Board's complaint were not employed by HSS on October 19, 2012, and that one employee has never been employed by HSS and is, in fact, a current member of the Hotel's kitchen staff. (Rostek May 2 Decl. ¶ 8.) In any event, none of these employees have expressed interest in being hired by Remington and this divergence has no effect on the Court's conclusion.

7

decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) (internal citations omitted); *see also Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 353 (E.D.N.Y. 2012) ("[T]he threshold for finding 'reasonable cause' is similar to the threshold for making out a *prima facie* case; courts have held that the petitioner need only come forward with evidence sufficient to spell out a likelihood of violation." (citations and internal quotation marks omitted)). As one court explained, "[t]he NLRB's 'version of the facts should be sustained if within the range of rationality, [and] inferences from the facts should be drawn in favor of the charging party.'" *Dunbar v. Landis Plastics, Inc.*, 977 F. Supp. 169, 175 (N.D.N.Y. 1997) (quoting *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir. 1980)).

Although the Circuits vary on the standard for determining whether granting Section 10(j) relief is "just and proper," in the Second Circuit, "injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Inn Credible Caterers*, 247 F.3d at 368. "Although this standard is meant to 'preserve[ ] traditional equitable principles governing injunctive relief,' a court should be mindful to apply this standard in the context of the N.L.R.A." *Renaissance Equity*, 849 F. Supp. 2d at 359 (alterations in original) (quoting *Inn Credible Caterers*, 247 F.3d at 368). In addition, "some degree of deference [to the Board] is warranted when the Regional Director seeks an injunction under section[] 10(j) . . . [and] [s]uch deference is especially appropriate in section 10(j) cases when the prevailing legal standard is clear and the only dispute concerns the application of that standard to a particular set of facts." *Silverman v. 40-41 Realty Assocs., Inc.*, 668 F.2d 678, 681 (2d Cir. 1982).

"[T]he appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred." *Inn Credible Caterers*, 247 F.3d at 369; *see also Kreisberg v. HealthBridge Mgmt., LLC*, 12-CV-1299, 2012 WL 6553103, at *6 (D. Conn. Dec. 14, 2012) ("The status quo that requires protection under § 10(j) is the status quo as it existed before the onset of the alleged unfair labor practices, not the status quo that has come into being as a result of the unfair labor practices being litigated."). In making a determination whether an injunction will prevent irreparable harm, the proper plaintiff is the Regional Director rather than individual employees. *Inn Credible Caterers*, 247 F.3d at 369; *see also HealthBridge*, 2012 WL 655103, at *7.

### III. DISCUSSION

#### A. Board's Authority to Pursue This Action

As a threshold matter, respondent argues that petitioner (the Regional Director) does not have authority to bring this action because the Board lacks a quorum to Act as required by statute. *See New Process Steel, L.P. v. N.L.R.B.*, 130 S. Ct. 2635, 2639 (2010) (citing 29 U.S.C. § 153(b)). Petitioner argues that the Board delegated authority regarding all court litigation, including the ability to initiate Section 10(j) proceedings, to the Acting General Counsel on November 9, 2011, when the Board had a quorum, and that the Acting General Counsel authorized the Regional Director to bring this current petition on April 22, 2013. (*See* Pet'r's Opp'n to Resp't's Mot. to Dismiss Pet. for Preliminary Injunction, May 16, 2013, at 2.)

8

The Court agrees with Judge Cogan's extremely thorough and well-researched decision in *Renaissance Equity Holdings*, 849 F. Supp. 2d at 343-52, that the General Counsel has authority to initiate this proceeding and authorize petitioner to file a Section 10(j) action. In that decision, Judge Cogan determined that Congress intended "to allow the Board to delegate its § 10(j) powers to the General Counsel . . . ." *Id.* at 374. Therefore, because "the Board had a duly-constituted quorum when it delegated its § 10(j) powers to the General Counsel" and because "Congress created the post of General Counsel to ensure that certain prosecutorial functions operate without regard to the Board[,] [t]he General Counsel's validly-delegated power to initiate § 10(j) petitions therefore does not vanish when the Board loses its quorum." *Id.* at 350. Judge Cogan then declined to reach the question of whether President Obama's recess appointments to the Board were valid because, even if they were not, the General Counsel would still have had the authority to bring the action. *Id.* at 350-352. Every other court to decide this issue has reached the same conclusion. *See, e.g.*, *Frankl v. HTH Corp.*, 650 F.3d 1334, 1347-54 (9th Cir. 2011); *Overstreet v. SFTC, LLC*, 13-CV-165, 2013 WL 1909154, at *3-7 (D.N.M. May 9, 2013); *Calatrello v. JAG Healthcare, Inc.*, 12-CV-726, 2012 WL 4919808, at *2-4 (N.D. Ohio Oct. 16, 2012); *Gottschalk v. Piggly Wiggly Midwest, LLC*, 861 F. Supp. 2d 962, 964-65 (E.D. Wis. 2012).[5]

B. The 10(j) Petition

1. Reasonable Cause

At the oral ruling on May 22, 2013, the Court assumed for purposes of this motion that the Board has demonstrated reasonable cause to believe that an unfair labor practice has been committed. However, because the Court now grants an injunction in part (prospectively restraining respondent from engaging in unfair labor practices), the Court considers this issue and finds that the Board has demonstrated reasonable cause.[6]

As discussed *supra*, the Board's threshold for demonstrating reasonable cause is low; it is similar to making out a prima facie case and this Court must give "appropriate deference" to the Board's determination that violations of the Act have occurred. *Major League Baseball Player Relations*, 67 F.3d at 1059. In addition, when an ALJ has made factual findings and issued a decision, the Court must also give appropriate deference to the ALJ's decision. *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 337 (2d Cir. 1999); *see also Hoffman v. Pennant Foods Co.*, 08-CV-008, 2008 WL 1777382, at *6 (D. Conn. Apr. 15, 2008) ("[O]nce the ALJ issues a decision, that decision can play a key role in the court's evaluation of the NLRB's petition."). The Board has met the minimal threshold of demonstrating reasonable cause to believe that violations of the Act occurred.

---

[5] Respondent also argues that there is no evidence in the record that the Board authorized this petition. However, as stated *supra*, the Board delegated authority to the General Counsel to bring this action on November 9, 2011, and petitioner does not need to introduce evidence of this because it is in the public record. *See* Order Contingently Delegating Authority to the General Counsel, 76 Fed. Reg. 69768-02 (Nov. 9, 2011).

[6] Although respondent vigorously disputes the alleged unfair labor practices, the Court does not believe it is necessary to hold a full evidentiary hearing because the "reasonable cause" standard is met, under the deferential standard discussed herein, based upon the evidence already before the Court. *See, e.g.*, *Calatrello v. Carriage Inn of Cadiz*, 06-CV-697, 2006 WL 3230778, at *2 (S.D. Ohio Nov. 6, 2006) (finding no hearing necessary). However, the Court emphasizes that it makes no conclusion regarding the ultimate merits of these disputed charges.

9

Under Section 8(a)(3) of the Act, an employer may not discriminate in the "hir[ing] or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). To demonstrate an unfair labor practice under Section 8(a)(3), "the General Counsel must show that the discharged employees' protected conduct was a motivating factor in the employer's decision." *Rood Trucking Co.*, 342 NLRB 895, 897 (2004) (citation and internal quotation marks omitted). Once the General Counsel demonstrates "discriminatory motivation," *see Donaldson Bros. Ready Mix, Inc.*, 341 NLRB 958, 961 (2004), "the burden shifts to the employer to demonstrate that it would have reached the same decision absent the protected conduct," *Wright Line*, 251 NLRB 1083, 1087 (1980). If the General Counsel proves that the employer's justification is pretext, there is no need for the employer to attempt to demonstrate that it would have taken the action absent the protected conduct because those reasons were false or not actually relied upon. *See Rood Trucking*, 342 NLRB at 898.

The Court concludes that there is sufficient evidence to demonstrate reasonable cause that, by contracting out of the housekeeping work to a company that it had recently terminated its relationship with and by failing to rehire the employees in October 2012, Remington violated Section 8(a)(3) of the Act. The timing of the union activity, combined with the on-again, off-again relationship between Remington and HSS, provides sufficient evidence to demonstrate reasonable cause that Remington used this subcontracting relationship to avoid unionization at the Hotel. *See Gaetano & Assocs. Inc. v. N.L.R.B.*, 183 F. App'x 17, 20 (2d Cir. 2006) ("[T]emporal proximity can be a sufficient basis from which to infer anti-union animus as a matter of law."); *Majestic Molded Prods., Inc. v. N.L.R.B.*, 330 F.2d 603, 606 (2d Cir. 1964) ("A power display in the form of a mass lay-off, where it is demonstrated that a significant motive and a desired effect were to 'discourage membership in any labor organization,' satisfies the requirements of § 8(a)(3) to the letter . . . ."); *Kreisberg v. Stamford Plaza Hotel & Conference Ctr., L.P.*, 849 F. Supp. 2d 279, 282 (D. Conn. 2012) (finding Board had demonstrated reasonable cause to believe that subcontracting out employees to frustrate union activity violated the Act); *see also FES*, 331 NLRB 9, 12 (2000) (stating that a violation of Section 8(a)(3) occurs if an employer fails to hire someone because of union activity or affiliation).

Petitioner has also demonstrated reasonable cause to believe Remington's termination of Loiacono violated the Act. Although the evidence regarding this discharge is not overwhelming, the Court defers to the Board and the ALJ because, based upon the evidence before the Court, it is within "the range of rationality" that this action violated the Act. *Mego Corp.*, 633 F.2d at 1031.

Under Section 8(a)(1), an employer may not "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1). "In evaluating questions arising from the interrogation of employees, the issue is whether the activity is calculated to frustrate the union's organization campaign by installing fear of reprisals in the employees. Where . . . there is no explicit threat, interrogation is lawful unless the circumstances indicate that coercion is implicit in the questioning." *N.L.R.B. v. Milco, Inc.*, 388 F.2d 133, 137 (2d Cir. 1968) (citation and internal quotation marks omitted). The Board has also demonstrated reasonable cause to believe that the

10

questioning of employees regarding union activity and membership was intended to coerce the employees into rejecting unionization.

In addition, there is evidence of a statement by Remington that it would more strictly enforce workplace rules if the employees unionized, and such evidence is sufficient to establish reasonable cause that there has been an unlawful threat in violation of Section 8(a)(1). *See Allegheny Ludlum Corp.*, 320 NLRB 484, 484 (1995) (stating that threatening employees with the loss of flexibility is unlawful).

2. Just and Proper

Due to the unique circumstances of this case, the Court finds that the Board has not demonstrated that an order of reinstatement of the employees is just and proper. The combination of the Board's delay in seeking an injunction and the employer's commitment to rehiring all discharged employees over a several month period counsels against an injunction in this particular case.

"[E]xcessive delay can undermine the propriety of § 10(j) relief [because,] [a]s time elapses, it becomes less likely that injunctive relief can undo harms that have occurred in the interim." *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544 (4th Cir. 2009). However, delay is common in these cases because of the time required for the Board to investigate allegations of unfair labor practices. Therefore, "'delay by itself is not a determinative factor in whether the grant of interim relief is just and proper. Delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief.'" *Blyer v. P & W Elec., Inc.*, 141 F. Supp. 2d 326, 332-33 (E.D.N.Y. 2001) (alteration, citation, and internal quotation marks omitted); *see also Blyer v. Jung Sun Laundry Grp. Corp.*, 10-CV-2975, 2010 WL 4722286, at *10 (E.D.N.Y. Nov. 15, 2010) ("[I]t is inappropriate to punish employees for the Regional Director's delay. The Court will only consider delay where delay leads to a change in circumstances which affects the appropriateness of the relief requested . . . ." (citations and internal quotation marks omitted)).

The delay in this case was substantial and weighs in favor of denying the injunction. Over 6 months passed between the discharge of the employees and the Board's filing of this action. Although some of this delay may not factor into the Court's determination because the Board was investigating the alleged unfair labor practice, petitioner completed its investigation in January when the complaint was brought before the ALJ and waited over 3 months before seeking relief in this Court. Petitioner admitted at oral argument that it "could have filed" for this injunction in January, but that it wanted to "establish an administrative record" due to the "logistical difficulties of the case." (Oral Arg. May 7, 2013, at 6.) To the extent petitioner suggested that it was more efficient and/or expeditious to proceed with the administrative hearing before seeking relief here, the Court notes that it took over 3 months to commence the hearing before the ALJ where a hearing before this Court would have taken place within a matter of weeks. At a minimum, if the level of irreparable harm from the lack of an immediate reinstatement order is as high as the Board now claims, the Board should have filed the action in this Court in January while the ALJ proceeding was taking place. The Court could have then, if it deemed it appropriate, delayed any hearing until the administrative record had been developed in

11

front of the Administrative Law Judge.[7] *See McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 965 (9th Cir. 2010) (upholding denial of injunctive relief and stating that "[m]ost of the delay in this case has resulted from the time taken by the litigation process itself, and the Regional Director cannot be faulted for that. But at least some of the delay was caused by the Regional Director's deferred petition for preliminary injunctive relief.").

Other courts also have found that a substantial delay weighed in favor of denying a Section 10(j) injunction. Although none of the cases are directly analogous to the facts in this action, the Court agrees with the reasoning set forth in those opinions.

In *Mack v. Air Express International*, 471 F. Supp. 1119 (N.D. Ga. 1979), one year passed between the unlawful labor practice and the court's consideration of the injunction. The court held that an injunction was not equitably necessary because, *inter alia*, of the delay. *See id.* at 1125 ("The lapse of one year since the take-over date makes any recreation of the Status quo ante most difficult."). In *Siegel v. Marina City Co.*, 428 F. Supp. 1090 (C.D. Cal. 1977), the court held that a "preliminary injunction could not preserve the status quo because the Board has waited three months since the alleged unfair labor practices occurred before filing its petition herein." *Id.* at 1093.

Similarly, in *Kaynard v. Lawrence Rigging, Inc.*, No. 72 C 315, 1972 WL 803 (E.D.N.Y. Mar. 31, 1972), in denying the Board's request for reinstatement of the terminated employees, the court noted that the changed circumstances during the period of delay counseled against such a remedy:

> Somewhat different considerations require refusal of a preliminary injunction to recall dismissed employees. Here the grounds are too uncertain, too much time has passed, and it is not certain that the relief has any relation whatever to the human needs of the men involved. Specifically, there is evidence, although as noted it is somewhat unclear, that recall had been offered to some or all of the men. There is no evidence that they are unemployed. The Board has the power to make back pay awards.

*Id.* at *7; *see also McLeod v. Art Steel Co.*, Nos. 71-Civil 2571, 2-CA-12327, 12331, 1971 WL 783, at *1 (S.D.N.Y. July 7, 1971) ("I am not convinced that in the present case the Board has met this strict standard. The alleged violations are old, the latest having occurred over three months ago. There is no showing that they are about to occur again. The unfair labor practice charge has been pending for almost two months, and was tried over a month ago. It is reasonable to expect a decision soon. There has not been a sufficient showing or irreparable harm to justify a court interfering at this stage and in effect doing the Board's work for it.").

The Board's delay alone, while weighing against a just and proper finding, would not by itself warrant denial of the injunction. *See, e.g.*, *Paulsen v. 833 Cent. Owners Corp.*, 12-CV-5502, 2012 WL 6021507, at *4 (E.D.N.Y. Dec. 4, 2012) (eleven month delay between the union's initial charge and Regional Director's petition not unreasonable); *Renaissance Equity Holdings*, 849 F. Supp. 2d at 361 (injunctive relief granted despite fourteen month delay).

---

[7] In fact, the Board has sought, and a court has considered, a Section 10(j) motion without an administrative record. *See Landis Plastics*, 977 F. Supp. at 176 (holding that "reasonable cause" prong could be decided without a formal evidentiary hearing even without the benefit of an administrative record).

However, the delay is significant in this case because the circumstances have materially changed since January. As stated *supra*, Remington has undertaken a good faith effort to rehire all discharged employees. On March 18, 2013, over one month prior to the filing of this Section 10(j), Remington sent notices of unconditional offers of employment to all of the HSS employees listed in the NLRB's complaint who were eligible for reinstatement. The letter stated that the Hotel had a position available for acceptance on an unconditional basis, and additional positions would be filled as they became available on a "first come-first serve" basis. As of May 17, 2013, 6 employees had accepted offers, 5 had declined offers, 2 offers were outstanding, and 8 had not responded at all. Therefore, as of the Court's ruling in May, there were only 16 employees remaining who were eligible for employment and who have expressed interest in returning to the Hotel. Remington has also promised to *only* hire housekeeping staff from the remaining employees who have expressed interest until all eligible employees have received offers. (Rostek May 17 Decl. ¶ 12.)

Furthermore, the Hotel's General Manager stated in his declaration that the housekeeping staff not only has high turnover, but that the Hotel intended to increase its rate of hiring during the summer as occupancy at the Hotel increased. Based on this representation, respondent's counsel stated at oral argument that he believed the Hotel would be able to make offers to all of the remaining employees within the next several months. Because respondent is essentially granting the relief that petitioner seeks from this Court, albeit on a slightly delayed basis, the Court believes it is not just and proper to force respondent to discharge the replacement employees who have committed no misconduct, and may have foregone other job opportunities during this period of delay. *See Crain v. Fabsteel Co. of La.*, 427 F. Supp. 316, 318 (W.D. La. 1977).

Because Remington's intention to aggressively rehire the discharged employees over the next several months is crucial to the Court's decision, the Court ordered Remington to submit a status report to the Court on the 15th day of every month regarding the current pace of hiring. The Court also noted at the time of the oral ruling that if Remington failed to follow the representations it had made in its affidavits and at oral argument, or in any way took any action that would result in all discharged employees not receiving offers in the next several months, the Court would allow petitioner to renew the motion and the Court would order the immediate reinstatement of all discharged employees.[8]

The Board has emphasized the irreparable harm the discharged employees in the absence of injunctive relief. The Board argued that this injunction was necessary to: (1) return unemployed workers to active employment, and (2) prevent employees from scattering. (*See* Pet'r's Mem. at 21-22.) Although the Court has carefully considered these arguments, they are not persuasive in this particular case due to the Board's delay in seeking relief. Employees have already scattered because of the Board's delay; a significant number of the discharged workers have either failed to express interest in returning to Remington or

---

[8] The Court notes that Remington has submitted three status reports regarding the rehiring of these employees. As of August 2, 2013, there are only 8 employees who have expressed interest in returning to the Hotel who have not received offers. (*See* ECF Nos. 20, 22, 27.) In addition, 4 of those 8 employees were AM shift housekeepers who have received offers for the PM shift, but have declined those offers and are awaiting offers for the AM shift. (Decl. of Jeff Rostek, Aug. 2, 2013 ¶ 8.)

13

have declined offers of employment. For example, by the time this motion was fully submitted to this Court on May 17, 2013, of the 37 employees eligible for reinstatement, 5 offers of reinstatement had already been declined and 8 employees had failed to respond to the employer's letter offering reinstatement. Thus, over one-third of the employees had scattered due to the Board's delay. The scattering of the employees only further highlights why the Board should have filed this action in January. Thus, by the time this action was filed, any ability to return the situation to the pre-discharge status quo had been substantially undermined by the delay.

The Board argues that this Court is giving current employees impermissible priority over discharged employees. *See Hoffman v. Parksite Grp.*, 596 F. Supp. 2d 416, 425 (D. Conn. 2009). This would only be the case if Remington was not currently hiring back all discharged employees that have expressed interest in returning to the Hotel. The discharged employees will all receive an offer of employment, the same relief this Court could afford, plus they will receive backpay should the ALJ's decision be upheld. However, if the Court were to prematurely order the reinstatement of these employees, and thus the termination of the innocent current employees, then current employees would lose their jobs without any remedy.

Although the Court does not find that it is just and proper to reinstate the employees, the Court finds that it is just and proper to issue an injunction to prevent future violations of the Act until the final disposition of the matter currently before the Board.[9] An injunction barring future violations will prevent any further deterioration of the Union's position during the pendency of the matter before the Board and address any "chilling effect" the terminations had on the employees' desire to unionize. *See Blyer v. Domsey Trading Corp.*, 91-CV-1304, 1991 WL 148513, at *3 (E.D.N.Y. July 30, 1991); *see also Mattina v. Chinatown Carting Corp.*, 290 F. Supp. 2d 386, 394 (S.D.N.Y. 2003) (enjoining future violations of the Act and stating that "[s]ince all of these actions [which the Board requests be enjoined] are clear violations of the Act, such an order for injunctive relief is not only reasonable, but necessary"). In other words, this injunction will prevent irreparable harm to the policy of the Act itself, *see Seeler v. Trading Port, Inc.*, 517 F.2d 33, 39 (2d Cir. 1975), by signaling to the current and returning employees that their statutory right to unionize will be protected, *see Stamford Plaza Hotel*, 849 F. Supp. 2d at 283 (although "the day-to-day life of [the] employees is not dramatically different than it was before" – because the employees have

---

[9] As noted *supra*, at a conference on July 22, 2013, petitioner clarified that it was seeking this injunction independent of the request for the reinstatement order. The language of the proposed injunction, which the Court is granting, is as follows: "The Court hereby enjoins and restrains the Respondent, its officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all members and persons acting in concert or participation with them, from: (1) discharging, refusing to hire, and/or refusing to consider for hire employees for engaging in union activity protected by the Act; (2) discharging employees based on its belief that employees are union supporters; (3) threatening employees with more onerous working conditions, decreased benefits, and futility in selecting the Union as their collective-bargaining representative; (4) threatening employees with discharge or immigration-related reprisals because of their support for and activities on behalf of a union; (5) informing employees that adverse employment actions resulted because of their support of a union; (6) interrogating employees regarding their union activities, and telling them to cease supporting a union; and (7) in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act."

14

merely been shifted to a subcontractor – finding an injunction necessary to reinvigorate the "spark to unionize" (citation and internal quotation marks omitted)).[10]

In sum, the Court concludes that an injunction reinstating the employees is not just and proper. The Court emphasizes that this decision is based upon the critical combination of factors in this case – namely, the delay by the Board in bringing this action and the employer voluntarily rehiring the employees at a rapid rate. However, the Court, with the consent of the respondent, will enjoin respondent from committing future violations of the Act.

### C. Injunction Pending Appeal

On July 22, 2013, exactly two months after the Court issued its original decision denying the motion for a preliminary injunction, petitioner filed a motion for an injunction pending appeal. "While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction . . . ." Fed. R. Civ. P. 62(c). "The standard in this circuit for a stay or injunction pending appeal is: (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected." *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994) (citation and internal quotation marks omitted).

Petitioner has not submitted any new evidence or arguments demonstrating how the Board would suffer irreparable injury in the absence of this reinstatement injunction pending appeal. As a threshold matter, as noted *supra*, if the Court were to grant this injunction pending appeal, the replacement employees would be discharged without remedy even though the former employees are currently being offered employment at a rapid pace, and it is likely that all employees will have received positions within the next 60 days (if not sooner), which will render the appeal moot. There is simply no evidence that any irreparable harm to the few employees awaiting reinstatement will take place over the next 2 months. In fact, the Board's delay of 2 months in filing its notice of appeal further supports the lack of any irreparable harm during this additional 60-day period. In short, for all of the reasons the Court denied the reinstatement order, it also denies the request for a reinstatement order pending appeal.

### IV. CONCLUSION

For the foregoing reasons, and the reasons set forth on the record on May 26, 2013, the Court grants in part and denies in part petitioner's motion for a preliminary injunction. Specifically, the Court denies the request for an immediate order of reinstatement. However, the Court grants the request for a prospective order restraining respondent from engaging in certain enumerated unfair labor practices. The Court will issue a separate injunction that sets forth the terms of the injunction (which are not in dispute). The Court denies petitioner's motion for an injunction pending appeal.

---

[10] As noted *supra*, although respondent does not believe the prospective injunction restraining it from committing unfair labor practices is necessary, it does not object to such an order. However, respondent does suggest that it should not be required to read the order aloud to groups of employees, and suggests that a copy be posted. The Court concludes, under the circumstances, that reading the order aloud is unnecessary, but that the order should be posted in the workplace (in English and Spanish) and a copy of the order (in English and Spanish) should be provided to all reinstated employees, as well as the 8 employees still awaiting reinstatement.

Respondent must continue to submit a letter to the Court regarding the status of the rehiring of employees on the 15th day of every month until reinstatement is complete.

               SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 14, 2013
       Central Islip, NY

              \* \* \*

Petitioner is represented by Ashok C. Bokde, Brent Childerhose, and Lara Haddad, National Labor Relations Board, Two Metrotech Center, Brooklyn, NY 11201. Respondent is represented by Paul E. Wagner, Stokes Roberts & Wagner, 903 Hanshaw Road, Ithaca, NY 14850 and Karl M. Terrell, Stokes Roberts & Wagner, 3593 Hemphill Street, Atlanta, GA 30337.